1

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8                 FOR THE DISTRICT OF OREGON

9

10   DANNY L. LINEBAUGH,              )
                                      )      No. CV 07-794-HU
11              Plaintiff,            )
                                      )
12        v.                          )
                                      )      FINDINGS AND
13   MICHAEL J. ASTRUE,               )      RECOMMENDATION
     Commissioner, Social             )
14   Security Administration,         )
                                      )
15              Defendant.            )
                                      )

16

17   Phyllis Burke
     4370 NE Halsey Street
     Portland, Oregon 97213
18        Attorney for plaintiff

19   Karin J. Immergut
     United States Attorney
20   District of Oregon
     Britannia Hobbs
21   Assistant United States Attorney
     1000 S.W. Third Avenue, Suite 600
22   Portland, Oregon 97204

23   Richard A. Morris
     Special Assistant United States Attorney
24   Office of the General Counsel
     Social Security Administration
25   701 Fifth Avenue, Suite 2900 M/S 901
     Seattle, Washington 98104
26        Attorneys for defendant

27

28   FINDINGS AND RECOMMENDATION Page 1

HUBEL, Magistrate Judge:

Danny Linebaugh brings this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33.

## Procedural Background

Mr. Linebaugh filed an application for benefits on November 3, 2003, alleging disability since November 2, 2002, based on an injury to the left ankle, degenerative joint disease, the loss of the left thumb, hearing loss, and depression. The application was denied initially and upon reconsideration. On April 3, 2006, a hearing was held before Administrative Law Judge (ALJ) Ralph W. Jones. On May 26, 2006, the ALJ issued a decision finding Mr. Linebaugh not disabled. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

Mr. Linebaugh was born in 1951. He was 51 years old at the alleged onset of disability and 54 years old at the time of the ALJ's decision. Mr. Linebaugh has a high school education and was in the United States Navy from 1971-77. His past relevant work is as a carpenter, flagger, and forklift operator. Mr. Linebaugh meets the insured status requirements of the Social Security Act through March 31, 2005. He has not worked since November 2002.

## Medical Evidence

In 1981, Mr. Linebaugh's left thumb was amputated after a

FINDINGS AND RECOMMENDATION Page 2

1  skill saw accident. Tr. 159, 164. On March 23, 1995, Mr. Linebaugh
2  sustained an injury at work which resulted in a grade II open tibia
3  fracture and a comminuted fibular fracture with subsequent
4  chondral[1] damage to the dome of the talus. Tr. 253. The fractures
5  healed, though the fibular fracture was a delayed union. Id.

6      Mr. Linebaugh underwent arthroscopic debridement on December
7  15, 1995, and was noted to have significant chondral damage. Id. He
8  attempted a return to work, but his treating physician, Terence
9  Sedgewick, M.D., wrote on July 31, 1996, that he had "only been
10 able to act on a sedentary basis." Id. According to Dr. Sedgewick,
11 a Physical Capacity Evaluation (PCE) "confirmed findings that he is
12 only able to tolerate walking from [sic] a 15-30 minute basis and
13 standing approximately 30 minutes." Id. Dr. Sedgewick thought he
14 could stand and walk one hour out of an eight hour day "with
15 frequent changes," and said that "he's also been noted to handle
16 weights up to 30 pounds." Id. Dr. Sedgewick concluded that Mr.
17 Linebaugh was stationary and released him for sedentary work. Tr.
18 254. Dr. Sedgewick noted that "in the future he might require an
19 arthrodesis if his posttraumatic DJD [degenerative joint disease]
20 becomes more problematic." Id.

21     Dr. Sedgewick wrote a letter on November 17, 1997, saying he
22 had last seen Mr. Linebaugh on July 31, 1996, and in which he
23 opined that Mr. Linebaugh was limited to no more than 20 pounds in
24 his ability to push and pull and that it would be "difficult for

25

26     [1] "Chondral" means pertaining to cartilage. Taber's
27 Cyclopedic Medical Dictionary 282 (14th ed. 1981).

28 FINDINGS AND RECOMMENDATION Page 3

1  him to return to activities that required standing, walking and
2  prolonged weight bearing across the left ankle." Tr. 252. In Dr.
3  Sedgewick's opinion, Mr. Linebaugh would have "difficulty with any
4  activities that required standing or walking." Dr. Sedgwick
5  concluded,

6      If a job could be found which he could perform sitting,
    I think he would be able to work in this capacity.
7      Unfortunately, anything that requires walking or standing
    for a duration greater than 10 to 15 minutes would be
8      poorly tolerated and would render him totally disabled.

9  Id.

10      The record contains no medical records for the years 1998-
11  2002. In March 2003, Mr. Linebaugh began treatment at the Veterans
12  Administration (VA). On March 13, 2003, he complained of a
13  depressed mood over the last six years, since the ankle injury. Tr.
14  196. Mr. Linebaugh said he had been unable to find employment due
15  to an inability to stand or walk for any length of time, saying,
16  "[A]s soon as I tell them what to expect with this problem they
17  stop talking to me." Id. He requested assistance in applying for
18  both VA disability benefits and non-service connected disability.
19  Id. Mr. Linebaugh was not deemed at risk for self-harm, and denied
20  a need for medications. Id. The diagnosis was adjustment disorder
21  with depressed mood. Id.

22      An April 29, 2003 chart note records Mr. Linebaugh's reports
23  of sleeping two to four hours at night, low energy and sadness. He

24
25
26
27
28  FINDINGS AND RECOMMENDATION Page 4

1  was started on trazodone[2] and citalopram[3], but was discontinued on
2  both in April 2003 after complaints of side effects. Tr. 193, 194.
3  Mr. Linebaugh discussed feelings of loss about the death of his
4  half brother in Vietnam and was encouraged to attempt contact with
5  that side of his family. Tr. 193. At that time, the diagnosis was
6  major depressive disorder. Tr. 194.

7       As of May 27, 2003, Mr. Linebaugh was taking velafaxine.[4] Tr.
8  192. He had complaints of continued sleep disturbance and
9  depression, but was "not amenable to increase in medication dose,"
10 although he agreed to try trazodone at a low dose. Id.

11      A VA chart note dated July 8, 2003, indicates that Mr.
12 Linebaugh was seen by Betty Ang, Ph.D., a psychiatric nurse
13 practitioner, for "survivor guilt and stress because of not being
14 able to gain employment because of disability." Tr. 184. Mr.
15 Linebaugh reported symptom onset "since the service in 1977," tr.
16 185, and reported being depressed with suicidal thoughts, low
17 energy, sleep averaging four to six hours with nightmares, memory
18 and concentration problems, and anger. Tr. 185. He also reported
19 poor attention span since childhood and said he "compulsively
20 counts things in his head." Id. Mr. Linebaugh said he had
21 nightmares about three times a week, the content of which were

---

23      [2] A sedative and antidepressant. See, e.g., http://
24 www.mentalhealthchannel.net.

25      [3] An antidepressant, also known as Celexa. See
26 http://www.medicinenet.com.

27      [4] An antidepressant, also known as Effexor. See
http://www.mentalhealthchannel.net.

28 FINDINGS AND RECOMMENDATION Page 5

"being back in the service, being in the combat zone ... just being back in the service." Id. When pressed for details, he replied,

> I keep seeing my brother getting killed over there while I was there. This is a brother who I didn't know I had until I was 16 and only met him twice. The last time I saw him, for about 15 to 20 minutes ... he was on his way to boot camp. The last time I heard of him, I heard he was killed over there (Vietnam). I don't even know his last name. His first name was Dennis. I can't even look him up on the Wall. It's tearing me up, too.

Tr. 185. According to the chart note, Mr. Linebaugh "voiced ambivalence" about counseling services to address his survivor guilt because he suspected "it will make it worse if I'm focusing on it." Id. Dr. Ang's initial diagnosis was major depression. Tr. 189.

On August 15, 2003, the VA notified Mr. Linebaugh that it was awarding him a pension of $807.00 per month, as of April 1, 2003, for hearing loss and tinnitus. Tr. 149-152. The pension is based on a disability rating of 30% for partial hearing loss and 10% for tinnitus. Tr. 150.

On August 19, 2003, Mr. Linebaugh was evaluated by Dr. Ang for major depressive disorder and post-traumatic stress disorder (PTSD). Tr. 181. The chart note states that Mr. Linebaugh's description of PTSD symptoms was "vague," and that onset of the depressive symptoms had been inconsistently reported as 1995, the date of his ankle injury, and "since the service in 1977." Tr. 182, 188. Mr. Linebaugh complained of nightmares, but he declined

FINDINGS AND RECOMMENDATION Page 6

prazosin[5] to address nightmares "because of his reluctance to take more medications." Tr. 182. Mr. Linebaugh also declined increasing his current dosage of venlafaxine. Id. Dr. Ang diagnosed dysphoria with constricted affect, but did not diagnose major depression or PTSD. Id. Dr. Ang wrote that Mr. Linebaugh "remains symptomatic at current dosage of medications, but declines increase or other medications to treat nightmares." Id. No medication changes were ordered, "at patient's request." Id.

On November 25, 2003, Dr. Ang wrote that Mr. Linebaugh had stopped taking venlafaxine because it "made me feel too weird." Tr. 178. Dr. Ang wrote that Mr. Linebaugh did "not like to take medications" and that he was not interested in counseling. Tr. 179. She wrote that Mr. Linebaugh was "stable on no meds at this time," and no future appointments were made. Tr. 179.

A VA chart note dated December 15, 2003 shows Mr. Linebaugh presenting with complaints of numbness in the left leg over the previous two years. Tr. 175. He reported that the numbness occurred after standing for a short time and resolved upon sitting. Id. X-rays and an MRI were ordered. Tr. 176.

On December 30, 2003, Mr. Linebaugh was examined by Lowan Stewart, M.D., at Social Security Administration's request. Tr. 158. Dr. Stewart did not review Mr. Linebaugh's records. Mr. Linebaugh complained of chronic left ankle pain since 1995. Id. Mr. Linebaugh reported that after the ankle injury he had taken

---

[5] An alpha-blocker used for high blood pressure and to improve sleep, also known as Minipress. See http://www.drugdigest.org

1  narcotic pain medication for several months, but subsequently took
2  Tylenol and ibuprofen, which did not seem to "completely help the
3  pain." Id. He reported pain around the entire ankle joint which was
4  unbearable upon standing for longer than five minutes. Id.

5      Mr. Linebaugh also reported lower back pain of one year's
6  duration, in both sides of his lumbar spine. Id. The pain was
7  constant, but aggravated upon standing for more than five minutes
8  or sitting for more than 20 minutes. Id.

9      Mr. Linebaugh said he also had occasional numbness down his
10 left leg and paresthesias[6] in the left leg with sitting more than
11 20 minutes. Tr. 159.[7] Mr. Linebaugh described this as his "primary
12 problem." Id.

13     Mr. Linebaugh reported that he enjoyed woodworking and was a
14 motorcycle enthusiast. Tr. 159. He lived with a friend and was able
15 to dress himself and take showers, but did little housework. Id. He
16 said he was unable to stand for more than about five minutes
17 without having to sit down, mostly because of lower back pain. Id.
18 Mr. Linebaugh said he had worked during the summer doing some
19 forklift work, but was fired as a result of ankle pain. Id.

20     Upon examination, Dr. Stewart found no midline spinal
21 tenderness, but some very mild bilateral paraspinous muscle

22 _____

23     [6] Paresthesias are defined as sensations of numbness,
24 prickling or tingling. Taber's Cyclopedic Medical Dictionary 1049
   (14th ed.)

25     [7] This statement is inconsistent with Mr. Linebaugh's report
26 two weeks earlier that he had numbness in the left leg after
   standing, and that the numbness was resolved upon sitting. Tr.
27 175.

28 FINDINGS AND RECOMMENDATION Page 8

tenderness. Tr. 161. There were no spasms or deformities. There was no sacriliac joint tenderness. The left ankle was tender diffusely over the medial and lateral malleoli and there was a small amount of edema just around the ankle, but no erythema or warmth. Id. Dr. Stewart diagnosed chronic left ankle pain secondary to fracture and surgical correction, chronic lower back pain with radiation down the left leg, and "intermittent paresthesias of uncertain etiology." Id.

In Dr. Stewart's opinion, Mr. Linebaugh was able to stand and walk about six hours of an eight hour work day, "limited by his subjective complaint of pain." Tr. 161-62. Dr. Stewart thought he could sit without restriction. Dr. Stewart wrote, "He may indeed need an assistive device regarding a cane as he did seem to have a significant limp and might have difficulty getting up stairs and going over uneven terrain without the cane."[8] Tr. 162. Dr. Stewart thought Mr. Linebaugh could carry 50 pounds occasionally and 20 pounds frequently, "though this would be limited by his use of a cane using one hand." Id. He was unable to stoop down completely because of decreased range of motion at the left ankle, but there were no manipulative limitations other than the lack of a left thumb, which meant Mr. Linebaugh had no finger opposition on that hand. Id.

---

[8] Dr. Stewart wrote that upon examination, Mr. Linebaugh had normal station and gait other than mild left-sided limp, and that he was "able to ambulate without a cane but primarily ambulates with a cane." Tr. 160. Mr. Linebaugh told him the cane was not prescribed, but was "suggested to him by a physician," and that he used it "all of the time." Id.

FINDINGS AND RECOMMENDATION Page 9

1    On January 3, 2004, Mr. Linebaugh was evaluated by Robert
2  Kruger, Psy. D., a clinical psychologist. Tr. 163. Mr. Linebaugh
3  described his daily activities as going to a tavern for coffee in
4  the morning, sitting with friends, and watching television. Tr.
5  164. In the afternoon, he watched television, visited with friends,
6  and rode his motorcycle. Id. In the evening he spent most of his
7  time watching television. Id. When asked about hobbies, Mr.
8  Linebaugh said he had a Harley-Davidson and had "always been a
9  motorcycle enthusiast." Id. Weather permitting, he enjoyed riding
10 his motorcycle. Id.

11   Mr. Linebaugh denied ever being hospitalized for psychological
12 difficulties or being currently involved in counseling, but said
13 that approximately a year earlier, he had received counseling
14 through the VA. He attended "two or three" sessions for treatment
15 of depressive symptoms. Id.

16   Mr. Linebaugh stated that he had an 80% disability rating from
17 the VA based on his ankle, thumb and a hearing loss. Tr. 165.[9]

18   On the basis of Mr. Linebaugh's self report, Dr. Kruger
19 concluded that Mr. Linebaugh was able to manage his self-care
20 skills and personal hygiene, various household tasks such as
21 kitchen and general house cleanup and personal laundry, and
22 finances, as well as drive his pickup and motorcycle. Tr. 165.
23 ///

24

25   [9] This statement is inconsistent with VA records from
   October 2003 and April 2005, which indicate that Mr. Linebaugh
26 has a 30% service-connected disability rating based on impaired
   hearing and a 10% service-connected disability rating based on
27 tinnitus. See, e.g., tr. 180, 296.

28 FINDINGS AND RECOMMENDATION Page 10

1      Dr. Kruger's mental status evaluation indicated that Mr.
2  Linebaugh was cooperative, pleasant, well mannered, in fair
3  spirits, and easy to interview. Tr. 165. He did not demonstrate any
4  gross articulation difficulties, and overall his speech was easily
5  understood. He was well oriented and his overall attention and
6  ability to sustain attention on brief, basic, routine, repetitive
7  tasks were good. Id. His performance on digit span was considered
8  good for his age group. Id. His overall comprehension of language
9  was grossly intact, as was his immediate, recent past, and remote
10 memory. Tr. 166. He was a good historian and had an adequate fund
11 of general information. Id. He was able to solve simple calculation
12 problems and his abstract reasoning abilities were good. Id.
13 Information and thought content were formulated in a reasonable and
14 understandable fashion. Id. His overall mood was noted as mildly
15 subdued, but for the most part he was in fair spirits. Id.

16     Although Dr. Kruger did not administer any psychometric tests,
17 his conclusion was that Mr. Linebaugh was functioning within the
18 average range. Id. Dr. Kruger wrote that Mr. Linebaugh did not
19 demonstrate or report any psychiatric symptomatology reflective of
20 a psychotic or anxiety related disorder, although he did report
21 features and symptoms of a mild depressive disorder. Tr. 167. Dr.
22 Kruger noted that Mr. Linebaugh's strengths "are such that he is
23 seen as of average intelligence, is articulate, and has a good work
24 ethic." Id. Dr. Kruger assessed Mr. Linebaugh as having depressive

25
26
27
28 FINDINGS AND RECOMMENDATION Page 11

1  disorder, not otherwise specified (NOS) and a GAF of 68.[10]

2       On January 12, 2004, Dorothy Anderson, Ph.D. completed a

3  review of Mr. Linebaugh's records and concluded that he had

4  depressive disorder, NOS. Tr. 221. On the basis of this conclusion,

5  Dr. Anderson rated Mr. Linebaugh as mildly limited in maintaining

6  concentration, persistence or pace, but having no other

7  limitations. According to Dr. Anderson's notes, Mr. Linebaugh's

8  depression was shown to be stabilized with medication. Tr. 230. She

9  found Mr. Linebaugh's description of PTSD symptoms vague. Id.

10      On January 12, 2004, Sharon Eder, M.D., an internist,

11 performed a records review. Tr. 246. Her findings were affirmed by

12 Martin Kehrli, M.D., on March 30, 2004. Tr. 251. In Dr. Eder's

13 opinion, Mr. Linebaugh had the physical capacity to lift 20 pounds

14 occasionally and 10 pounds frequently; stand and/or walk about six

15 hours out of an eight hour workday; sit for about six hours in an

16 eight hour work day; and push and pull on an unlimited basis. Tr.

17 247. Dr. Eder also found that Mr. Linebaugh was precluded from

18 frequent climbing, balancing, stooping, crouching and crawling, and

19

20      [10] The GAF (Global Assessment of Functioning) scale is used
21 by mental health professionals to assess psychological, social
   and occupational functioning. A GAF between 31 and 40 indicates
22 major impairment in several areas. A GAF between 41 and 50
   indicates serious symptoms or any serious impairment of
23 functioning, including being unable to keep a job. A GAF of 51-60
   indicates moderate symptoms or moderate difficulty in social,
24 occupational or school functioning. A GAF of 61-70 indicates some
   mild symptoms or some difficulty in social, occupational or
25 school functioning but generally functioning well, with some
26 meaningful interpersonal relationships. Diagnostic and
   Statistical Manual of Mental Disorders, Fourth Edition Text
27 Revision (2000)(DSM-IV-TR) 34.

28 FINDINGS AND RECOMMENDATION Page 12

1  that he had limited fine manipulation skills, as a result of the
2  amputated left thumb. Tr. 249.

3      X-rays taken of the lumbar spine on February 9, 2004 indicated
4  degenerative changes, especially at L3-L4 and L4-L5. Tr. 206. At
5  L3-L4, there was loss of intervertebral disc space and minimal
6  narrowing of the right neural foramina due to the disc bulge. Tr.
7  205. At L4-L5 there was moderate broad-based disc protrusion
8  resulting in moderate central canal and mild left neural foraminal
9  stenosis. Id. An MRI of the lumbar spine done the same day showed
10 degenerative changes of the lumbar spine, but no significant
11 central canal or neural foraminal stenosis except at L4-L5, which
12 showed moderate central canal and mild left neural foraminal
13 stenosis. Tr. 279.

14     On February 15, 2005, Mr. Linebaugh was seen for complaints of
15 chronic neck pain, which he said started when he was in the
16 service. Tr. 300. Mr. Linebaugh refused medication. Id. He stated
17 that he was walking with a cane because of the ankle injury, but
18 felt well otherwise. Id. He denied feeling depressed. Id.

19     On March 9, 2005, Mr. Linebaugh was seen for complaints of
20 numbness in the left leg upon standing. An x-ray of the cervical
21 spine taken that day showed degenerative changes with interspace
22 narrowing at C5-6. Tr. 277. These results were characterized as
23 "some degenerative changes in the cervical spine but ... no acute
24 abnormality." Tr. 278. In March 2005, Mr. Linebaugh was prescribed
25 Zocor for elevated lipids, tr. 298, but on July 28, 2005, Mr.
26 Linebaugh admitted to a nurse that he had never taken the Zocor
27
28 FINDINGS AND RECOMMENDATION Page 13

1  since the primary care physician ordered it. Tr. 288. He agreed to

2  begin taking the Zocor. Id.

3      A records review was done by Frank Lahman, Ph.D on March 30,

4  2004. Tr. 232. In his opinion, Mr. Linebaugh's impairment was not

5  severe, and consisted of a depressive disorder. Id. Dr. Lahman

6  opined that Mr. Linebaugh was mildly limited in his activities of

7  daily living, maintaining social functioning, and maintaining

8  concentration persistence and pace. Tr. 242.

9      Mr. Linebaugh received psychological counseling on four

10 occasions between June 1, 2005 and July 13, 2005. Tr. 258. The

11 chart note states that following the fourth session, "it was

12 decided that counseling should no longer continue because the

13 client's primary concerns were physical in nature and not mental or

14 emotional." Id. Mr. Linebaugh had stated that his commitment to

15 counseling was

> mainly to assist him to received [sic] disability because
> of chronic back pain due to arthritis and a serious ankle
> injury. ... Client feels he is unable to stand for any
> extended period of time or do any physical labor because
> of his chronic injuries. These restrictions do cause the
> client to be very frustrated, irritated, depressed. ...
> However, client is able to adjust to lack of finances and
> physical disabilities in a way that seems appropriate.
> Client agrees that counseling is not a necessity for him.

21 Tr. 259.

22     In July 2005, Mr. Linebaugh complained of shortness of breath

23 and difficulty breathing upon awakening. Tr. 288-290. In August

24 2005, Mr. Linebaugh was diagnosed with sleep apnea, but he declined

25 a continuous positive airway pressure (CPAP) machine at that time.

26 Tr. 281.

27

28 FINDINGS AND RECOMMENDATION Page 14

1   In September 2005, Mr. Linebaugh was seen on several occasions
2   for complaints of neck pain. Tr. 285-287. On September 29, 2005, he
3   was asked whether he had been depressed or sad during most of the
4   last year, and Mr. Linebaugh responded, "No." Tr. 285.

5   On October 7, 2005, Mr. Linebugh was given an MRI of the
6   cervical spine, which showed multilevel cervical spondylosis with
7   multilevel foraminal stenosis, and right sided C2-3 disc protrusion
8   with moderate right foraminal stenosis. No cord impingement was
9   seen. Tr. 276-77. On October 11, 2005, Mr. Linebaugh reported that
10  his neck pain had improved with Motrin, but that he now had back
11  pain, for which he had not taken Motrin. Tr. 268. He was advised to
12  continue with the Motrin. Id.

13  On January 10, 2006, Mr. Linebaugh was provided a CPAP machine
14  for sleep apnea. Tr. 269.

15  On February 22, 2006, Mr. Linebaugh was given a psychological
16  evaluation by Karan Randhava, M.D., for complaints of depression
17  over the past two years. Tr. 265-66.[11] Mr. Linebaugh said he had
18  previously tried citalopram and venlafaxine, but took them only
19  briefly due to adverse side effects. Id. Mr. Linebaugh's current
20  medications were ibuprofen, 800 mg. three times a day for neck
21  pain, sildenafil citrate as needed one hour before intimacy, and
22  simvastatin to lower cholesterol. Tr. 266.

23  Dr. Randhava noted that Mr. Linebaugh was friendly and
24  cooperative, maintained good eye contact, and evinced normal

25  _____

26  [11] Although five months earlier, in September 2005, Mr.
    Linebaugh denied being depressed during the previous year. Tr.
27  285.

28  FINDINGS AND RECOMMENDATION Page 15

speech. Id. Cognition was grossly intact and insight and judgment were both good. Id. In Dr. Randhava's opinion, Mr. Linebaugh's depression was "likely triggered by functional limitations and health decline, as well as limited income," id., but noted that Mr. Linebaugh had a "good support system in place." Id. Dr. Randhava noted Mr. Linebaugh's report that he drank a case of beer a week, tr. 265, "which likely exacerbates his depressed mood." Tr. 266. Dr. Randhava assessed his GAF at 60. Id. Psychotropic medications and sleep aids were discussed, but declined at that time, and Mr. Linebaugh was counseled on "alcohol's adverse effects with regards to depression and increased risk of suicide." Tr. 267.

### Hearing Testimony

Mr. Linebaugh testified that he last worked as a forklift driver in November 2002, a job from which he was "let go" because his ankle prevented him from "do[ing] the job sufficiently." Tr. 349. He said both his previous jobs as a forklift driver had required him to be on his feet for significant amounts of time. Tr. 352-53, 354. Before driving a forklift, Mr. Linebaugh had been employed as a flagger, but said he was fired from that job because he "couldn't move around fast enough to maintain the traffic." Tr. 350-51.

Mr. Linebaugh said he was prevented from returning to work as a forklift driver because of back pain, numbness in his leg, and neck pain. Tr. 355. He stated that he is unable to stand more than five minutes at a time. Id. He characterized the pain in his neck as a nine on a 10-point scale, and described it as "like a muscle

FINDINGS AND RECOMMENDATION Page 16

cramp that goes into my temple," that sometimes "actually made me drop to the floor." Tr. 357-58. He takes ibuprofen for the pain in his neck and in his back. Tr. 359. He has also smoked marijuana for back pain. Tr. 359. He rated his back pain as a seven or eight on a 10-point scale, and said his leg pain was more severe than that. Id. He does not take any medication except ibuprofen for pain because he has "a real phobia about taking pills." Tr. 367. The main thing he does to control the leg and back pain is recline with his leg elevated. Tr. 367. Mr. Linebaugh said he does not think he could spend more than an hour or two walking or standing during an eight hour work day, nor would he be able to sit for six hours of an eight hour day without having his leg go numb and his back start cramping. Tr. 368. Mr. Linebaugh said, "I'll stand up and it'll relieve it, and then five minutes after or less it'll start up again so I got to sit down... in a recliner." Tr. 369.

Mr. Linebaugh said he rides a Harley-Davidson motorcycle, taking 45-mile trips about once a month that involve two stops to rest his back. Tr. 360. Mr. Linebaugh testified that he had cut his alcohol consumption from a case every few days to about a six-pack a week. Tr. 360.

Mr. Linebaugh said he had been unable to do household chores since the injury to the ankle, tr. 364, and that he uses a cane 70-80% of the time for standing and walking, to relieve his ankle and back. Tr. 365.

Mr. Linebaugh testified that his nightmares had resolved when he began using the CPAP machine for sleep apnea. Tr. 366. He

FINDINGS AND RECOMMENDATION Page 17

1 thought his depression might also have been caused by sleep apnea.

2 Id.

3     A vocational expert (VE), Scott Stipe, testified. Tr. 369. The

4 ALJ asked the VE to consider a hypothetical individual of Mr.

5 Linebaugh's age, educational level, and experience who had the

6 residual functional capacity to perform light work, lifting 20

7 pounds frequently, sitting standing and walking about six hours in

8 an eight hour day, unlimited pushing and pulling, limited to only

9 occasional climbing, stooping and crouching, and no capacity to

10 grip or pinch large objects with the left hand. Tr. 370-71. The VE

11 opined that such an individual could return to Mr. Linebaugh's past

12 relevant work as a flagger. Tr. 371.

13     The ALJ then asked the VE to "assume the correctness" of Mr.

14 Linebaugh's testimony, and asked whether there was other work he

15 could perform. Tr. 371. In Mr. Stipe's opinion, Mr. Linebaugh could

16 work as a small products assembler, (light, unskilled), or an

17 electronics worker (light, unskilled), with the proviso that if Mr.

18 Linebaugh's manipulative ability with the left hand was "less than

19 the ability to simply maneuver an item," he would not be able to

20 perform those jobs. Tr. 372. The ALJ then asked Mr. Linebaugh

21 whether he was able to close his fingers down on the stub of his

22 thumb, to which Mr. Linebaugh responded that he could. Tr. 372.

23 When asked whether he was able to pinch with finger and thumb, Mr.

24 Linebaugh said yes, but that "as far as minute things I can't

25 manipulate them." Tr. 373.

26     The VE opined that the individual in the ALJ's second

27

28 FINDINGS AND RECOMMENDATION Page 18

hypothetical question could work as a parking lot cashier or a parking lot attendant, which requires only periods of standing, usually five to ten minutes, before being able to sit again. Tr. 373-74. The VE acknowledged, however, that a person using a cane might have difficulty doing the sorting required of a parking lot cashier, but would be able to perform the assembly jobs because they are performed in a sitting position. Tr. 374.

**ALJ's Decision**

The ALJ found that Mr. Linebaugh's ankle injury and degenerative changes of the lumbar and cervical spine were severe impairments. Tr. 30. He found that Mr. Linebaugh's hearing loss and tinnitus were not severe impairments, although he noted that the VA had awarded Mr. Linebaugh a 30% service connected disability for hearing loss. The ALJ did not find the hearing loss severe because the record showed no treatment for this condition and because Mr. Linebaugh alleged no work-related limitations as a result of hearing loss. Tr. 31. The ALJ found that Mr. Linebaugh had been diagnosed with Depressive Disorder NOS on January 3, 2004, but found it a non-severe impairment because Mr. Linebaugh had never been hospitalized for psychiatric illness and had only attended two or three counseling sessions through the VA. The ALJ found that the mental health evaluation by the VA on March 13, 2003 contained a diagnosis of Adjustment Disorder with depressed mood and a GAF of 60, but concluded that a GAF of 60 constituted only moderate symptoms.

///

FINDINGS AND RECOMMENDATION Page 19

1    The ALJ concluded that Mr. Linebaugh's impairments, considered
2    singly or in combination, did not meet or equal one of the listed
3    impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4    The ALJ found that Mr. Linebaugh had the residual functional
5    capacity to perform light work, with lifting no more than 20 pounds
6    at a time and frequent lifting of no more than 10 pounds. The range
7    of light work Mr. Linebaugh was capable of doing was narrowed by
8    being limited to only occasional climbing  and manipulative
9    limitations because of his amputated thumb. Tr. 31-32.

10    Based on the testimony of the VE, the ALJ concluded that Mr.
11    Linebaugh was able to return to his previous work as a flagger. Tr.
12    36. Alternatively, the ALJ found that Mr. Linebaugh was able to do
13    other work existing in the national economy, including small
14    products assembler, electronics worker, cashier, and parking lot
15    attendant. Tr. 37-38.

16                              **Standard**

17    The court must affirm the Commissioner's decision if it is
18    based on proper legal standards and the findings are supported by
19    substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111,
20    1113 (9th Cir. 1999). Substantial evidence is such relevant evidence
21    as a reasonable mind might accept as adequate to support a
22    conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971);
23    Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In
24    determining whether the Commissioner's findings are supported by
25    substantial evidence, the court must review the administrative
26    record as a whole, weighing both the evidence that supports and the

27

28    FINDINGS AND RECOMMENDATION Page 20

1  evidence that detracts from the Commissioner's conclusion. <u>Reddick</u>
2  <u>v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998). However, the
3  Commissioner's decision must be upheld even if "the evidence is
4  susceptible to more than one rational interpretation." <u>Andrews</u>, 53
5  F.3d at 1039-40.

6      The initial burden of proving disability rests on the
7  claimant. <u>Meanel</u>, 172 F.3d at 1113; <u>Johnson v. Shalala</u>, 60 F.3d
8  1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must
9  demonstrate an "inability to engage in any substantial gainful
10 activity by reason of any medically determinable physical or mental
11 impairment which ... has lasted or can be expected to last for a
12 continuous period of not less than 12 months[.]" 42 U.S.C. §
13 423(d)(1)(A).

14     A physical or mental impairment is "an impairment that results
15 from anatomical, physiological, or psychological abnormalities
16 which are demonstrable by medically acceptable clinical and
17 laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This
18 means an impairment must be medically determinable before it is
19 considered disabling.

20     The Commissioner has established a five-step sequential
21 process for determining whether a person is disabled. <u>Bowen v.</u>
22 <u>Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

23     In step one, the Commissioner determines whether the claimant
24 has engaged in any substantial gainful activity. 20 C.F.R. §§
25 404.1520(b), 416.920(b). If not, the Commissioner goes to step two,
26 to determine whether the claimant has a "medically severe
27
28 FINDINGS AND RECOMMENDATION Page 21

impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in

FINDINGS AND RECOMMENDATION Page 22

1  consideration of the claimant's age, education and past work
2  experience. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f),
3  416.920(f).

**Discussion**

5  Mr. Linebaugh contends that the Commissioner's decision is
6  erroneous as a matter of law and is not based on substantial
7  evidence in the record in the following respects: 1) failure to
8  consider all of his impairments; 2) failure to accord proper weight
9  to the VA finding of permanent and total disability; 3) improper
10 rejection of medical source opinions and the statements and
11 testimony of Mr. Linebaugh and his lay witnesses; 4) improper
12 reliance on an incomplete hypothetical to the VE; and 5) failure to
13 find disability at step five under the Medical-Vocational
14 Guidelines ("the grids").

15   1.   Failure to consider all impairments

16   An impairment or combination of impairments can be found not
17 severe only if the evidence establishes a slight abnormality that
18 has no more than a minimal effect on individual's ability to work,
19 and the adjudicator must consider the combined effect of all
20 impairments. Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996).
21 Step two of the sequential analysis is a "de minimis screening
22 device used to dispose of groundless claims," id., and an ALJ may
23 find that a claimant lacks a medically severe impairment or
24 combination of impairments only when his conclusion is "clearly
25 established by medical evidence." Webb v. Barnhart, 433 F.3d 683,
26 687 (9th Cir. 2005), citing Social Security Ruling 85-28.

28 FINDINGS AND RECOMMENDATION Page 23

1    Mr. Linebaugh contends that the ALJ erred in failing to find
2  the following impairments severe: 1) partial hearing loss and
3  tinnitus; 2) depression; 3) obesity; 4) thumb amputation; and 5)
4  sleep apnea.

5         a.    Partial hearing loss and tinnitus

6    The record shows that the VA awarded Mr. Linebaugh a pension
7  based on ratings of 30% disability for partial hearing loss and 10%
8  disability for tinnitus. The ALJ stated in his opinion that he did
9  not consider these impairments severe because Mr. Linebaugh did not
10  allege work-related limitations as a result of these impairments.
11  Mr. Linebaugh counters that he reported during an audiology
12  examination on July 12, 2003 that he had difficulty hearing in
13  "noisy communication situations, in groups ... and on the
14  telephone." Tr. 342. Upon testing, the audiologist found "a
15  moderate to severe notched sensorineural hearing loss bilaterally,"
16  although speech recognition scores were good bilaterally;
17  tympanometry revealed normal compliance, volume and pressure
18  bilaterally; and acoustic reflex thresholds were within normal
19  limits bilaterally. Id. Mr. Linebaugh told the audiologist that the
20  tinnitus consisted of a "moderate, high-pitched ringing sound." Id.

21    Mr. Linebaugh's testimony at the hearing made no reference to
22  hearing loss or tinnitus. However, Mr. Linebaugh did say to the
23  audiologist that he had difficulty hearing in noisy communication
24  situations, and this statement is supported by the evidence of the
25  VA's disability award and the audiology testing. This evidence
26  precludes the ALJ from considering Mr. Linebaugh's hearing
27
28  FINDINGS AND RECOMMENDATION Page 24

impairment de minimis. The ALJ did not include tinnitus or hearing loss in his hypothetical question to the VE. I recommend that this case be remanded to the Commissioner for the ALJ to make findings on the effect of Mr. Linebaugh's partial hearing loss and tinnitus with respect to his ability to perform the jobs identified by the ALJ: small products assembler, electronics worker, cashier, and parking lot attendant.(See discussion of ALJ's failure to give any weight to the VA disability rating, below.)

b. Depression

The medical evidence shows that except for four counseling sessions in June and July 2005, Mr. Linebaugh was not treated for depression after November 2003, and that Mr. Linebaugh had declined offers of medication and counseling. In January 2004, Dr. Kruger diagnosed mild depression; this was also Dr. Anderson's diagnosis after records review. After the fourth counseling session in July 2005, Mr. Linebaugh agreed that counseling was not needed, and that his concerns were physical, rather than mental or emotional. Taken as a whole, the record contains substantial evidence supporting the ALJ's finding that Mr. Linebaugh's depression was not a severe impairment during the time Mr. Linebaugh was covered for disability benefits.[12] I recommend that this finding be affirmed.

c. Obesity

The ALJ must consider the effect of obesity on a claimant's ability to work. Hammock v. Bowen, 879 F.2d 498, 503-04 (9th Cir.

---

[12] Dr. Randhava wrote on February 22, 2006 that Mr. Linebaugh had agreed to a trial of fluoxetine, tr. 267, but this was after Mr. Linebaugh's period of eligibility for disability benefits.

FINDINGS AND RECOMMENDATION Page 25

1  1989)(en banc); <u>Celaya v. Halter</u>, 332 F.3d 1177, 1181 (9th Cir.

2  2003). The evidentiary record indicates that Mr. Linebaugh is 6'3"

3  and that his weight has been recorded at approximately 280-300

4  pounds or more for several years. See, e.g., tr. 159, 270, 281,

5  321. The ALJ cannot assume that Mr. Linebaugh's obesity was

6  remediable without making factual findings to that effect. <u>Dodrill</u>

7  <u>v. Shalala</u>, 12 F.3d 915 (9th Cir. 1993). I recommend that this case

8  be remanded for the Commissioner to consider the effect of obesity

9  on Mr. Linebaugh's ability to work.

10         d.   Amputated thumb

11         Mr. Linebaugh contends that his amputated left thumb impairs

12  his ability to perform gross and fine manipulation much more

13  significantly than reflected in the ALJ's hypothetical to the VE,

14  which included only limitations on the ability to "grip or pinch

15  large objects" with the left hand. Tr. 371. Dr. Stewart found that

16  Mr. Linebaugh had no finger opposition on the left hand, tr. 161,

17  and reviewing physicians Eder and Kehrli opined that while Mr.

18  Linebaugh had no limitations on gross manipulation, he was limited

19  with respect to fine manipulation. Tr. 249. Mr. Linebaugh testified

20  that "as far as minute things I can't manipulate them," because

21  "I'm working with a blunt stub here." Tr. 373. The ALJ found, on

22  the basis of VE testimony, that if Mr. Linebaugh "could use his

23  non-dominant hand (left hand) for simply holding small items, as

24  opposed to extensive gripping or dexterity, he could still do small

25  products assembler and electronics worker," tr. 38, but this

26  ///

27

28  FINDINGS AND RECOMMENDATION Page 26

finding does not accurately reflect the ALJ's hypothetical to the VE or the underlying medical evidence.

I conclude that the ALJ's finding that Mr. Linebaugh could perform the jobs of small products assembler and electronics worker is inconsistent with both the hypothetical posed to the VE by the ALJ and the manipulative limitations found by Doctors Stewart, Eder and Kehrli, and testified to by Mr. Linebaugh. The opinions of Doctors Stewart, Eder and Kehrli were addressed to the issue of fine manipulation, but the ALJ's hypothetical to the VE included only the ability to hold or pinch large objects. The ALJ's conclusion that Mr. Linebaugh could work as a small products assembler and electronics worker was premised on the ability to hold small items.

These inconsistencies make the court unable to review the evidentiary basis for the ALJ's conclusion that Mr. Linebaugh could work as a small products assembler or electronics worker. I recommend that this case be remanded to the Commissioner for determination of the effect of Mr. Linebaugh's manipulative limitations on his residual functional capacity.

e.    Sleep apnea

Mr. Linebaugh was not diagnosed with sleep apnea until August 2005, after expiration of his eligibility for disability benefits. He declined treatment for sleep apnea until January 10, 2006, when he agreed to begin using a CPAP machine. Mr. Linebaugh testified that the machine had helped him with nightmares and with sleeping.
///

FINDINGS AND RECOMMENDATION Page 27

1  Tr. 366. The ALJ did not err in failing to find that sleep apnea

2  was a severe impairment.

3      2.   Failure to accord weight to VA disability finding

4      In McCartey v. Massanari, 298 F.3d 1072 (9th Cir. 2002), the

5  court held, as a matter of first impression, that the ALJ must

6  ordinarily give great weight to a VA determination of disability.

7  The court did so because of the "marked similarity between these

8  two federal disability programs." 298 F.3d at 1076. However,

9  because the VA and Social Security Administration criteria for

10 determining disability are not identical, the ALJ may give less

11 weight to a VA disability rating if he gives persuasive, specific,

12 valid reasons for doing so that are supported by the record. Id.

13     Mr. Linebaugh argues that the VA has found him "permanently

14 and totally disabled" since at least March 27, 2003, citing to the

15 award letter, which indicates that the VA considered, but did not

16 approve, Mr. Linebaugh's eligibility for a pension based on 80%

17 disability for the combination of ankle injury, major depressive

18 disorder, and left thumb amputation. Tr. 154. The evidentiary

19 record does not support the assertion that Mr. Linebaugh is

20 "totally disabled," or even that he is 80% disabled. See, e.g., tr.

21 295 (chart note dated April 18, 2005 stating that Mr. Linebaugh has

22 a combined 40% disability rating for impaired hearing and

23 tinnitus). The pension award letter clearly states that Mr.

24 Linebaugh's VA disability pension is based on a 40% disability

25 rating for the combination of partial hearing loss and tinnitus.

26 ///

27

28 FINDINGS AND RECOMMENDATION Page 28

1 The ALJ did not err in failing to find Mr. Linebaugh totally
2 disabled on the basis of a VA pension.

3      The ALJ's stated reason for disregarding the VA's disability
4 rating based on Mr. Linebaugh's hearing loss and tinnitus was that
5 the standards followed by the VA were different from those of the
6 Social Security Administration, so that he was not "bound" by the
7 VA's decisions. This reason is not sufficiently specific or valid
8 to support the ALJ's failure to consider the effect of VA's
9 disability rating on Mr. Linebaugh's asserted impairments of
10 hearing loss and tinnitus. I recommend that this case be remanded
11 for the Commissioner to consider the effect of the VA's disability
12 rating, based on partial hearing loss and tinnitus, on Mr.
13 Linebaugh's ability to work.

14      3.   Rejection of medical source opinions

15      If a treating physician's medical opinion is supported by
16 medically acceptable diagnostic techniques and is not inconsistent
17 with other substantial evidence in the record, the treating
18 physician's opinion is given controlling weight. Holohan v.
19 Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001). An ALJ may reject
20 the uncontradicted medical opinion of a treating physician only for
21 "clear and convincing" reasons supported by substantial evidence in
22 the record. Id. If the treating physician's medical opinion is
23 inconsistent with other substantial evidence in the record,
24 treating source medical opinions are still entitled to deference.
25 Id.
26 ///

27

28 FINDINGS AND RECOMMENDATION Page 29

1    The ALJ may rely on the medical opinion of a non-treating
2  doctor instead of the contrary opinion of a treating doctor only if
3  she or he provides "specific and legitimate" reasons supported by
4  substantial evidence in the record. Id. This can be done by setting
5  out a detailed and thorough summary of the facts and conflicting
6  medical evidence, stating his interpretation of them, and making
7  findings. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998).
8    Mr. Linebaugh asserts that the ALJ improperly rejected the
9  opinions of treating doctor Sedgewick and examining doctor Stewart.
10 Dr. Sedgewick opined in 1995 that Mr. Linebaugh's ankle impairment
11 limited him to standing and walking no more than a total of one
12 hour in an eight hour day, with frequent position changes. Mr.
13 Linebaugh argues that if this limitation is accepted, it is, as the
14 VE acknowledged at the hearing, inconsistent with the ability to
15 work as a flagger, a job that requires significant standing.

16    Dr. Sedgewick's 1995 opinion that Mr. Linebaugh was limited to
17 standing and walking no more than a total of one hour in an eight
18 hour day is inconsistent with the 2003 opinion of examining
19 physician Dr. Stewart, that Mr. Linebaugh was able to stand and
20 walk about six hours of an eight hour work day, "limited by his
21 subjective complaint of pain." It is also inconsistent with the
22 2004 findings of reviewing physicians Eder and Kehrli that Mr.
23 Linebaugh was able to stand and/or walk for about six hours of an
24 eight hour work day. Dr. Sedgwick's opinion is not uncontradicted,
25 so the ALJ was required to give specific and legitimate reasons for
26 rejecting it.

27

28 FINDINGS AND RECOMMENDATION Page 30

1    The ALJ stated that he had given "no weight" to Dr.
2  Sedgewick's opinion. Tr. 36. One stated reason was that the lifting
3  limitation of up to 30 pounds was inconsistent with releasing Mr.
4  Linebaugh for "sedentary" work. I do not find this reason specific
5  or legitimate. Dr. Sedgewick simply said Mr. Linebaugh "had been
6  noted to" handle weights up to 30 pounds; this is not an opinion on
7  Mr. Linebaugh's lifting and carrying capacity, and even if it were,
8  its inconsistency with Social Security Administration regulations'
9  definition of sedentary work see 20 C.F.R. § 416.967(a)[13], does not
10 warrant the ALJ's rejection of Dr. Sedgewick's opinion. As Mr.
11 Linebaugh points out, Social Security Ruling 96-5p instructs
12 adjudicators not to assume that a medical source using such terms
13 as "sedentary" is applying the definition given that term by Social
14 Security regulations.

15    The ALJ rejected Dr. Sedgewick's opinion, given in November
16 1997, that Mr. Linebaugh could not walk or stand for more than 10
17 to 15 minutes at a time because it was inconsistent with Dr.
18 Sedgewick's opinion of July 1996 that Mr. Linebaugh could not
19 tolerate walking more than 15 to 30 minutes at a time or standing
20 for more than 30 minutes. Tr. 36. The ALJ noted that Dr. Sedgewick
21 had not seen or treated Mr. Linebaugh between July 1996 and
22 November 1997, so that there was no basis for finding Mr. Linebaugh
23 more disabled in November 1997 than in July 1996. This reason for
24 rejecting Dr. Sedgewick's opinion is specific and legitimate.

25

26    [13] Under this regulation, sedentary work involves lifting no
27 more than 10 pounds at a time.

1    Mr. Linebaugh also challenges the ALJ's rejection of Dr.
2 Sedgewick's opinion on the ground that it was offered before Mr.
3 Linebaugh's alleged onset date of November 2002. Mr. Linebaugh
4 argues that according to Dr. Sedgewick, the ankle injury was
5 permanent and stationary by 1996. While this is true, the record as
6 a whole indicates that subsequent to Dr. Sedgewick's reports, Mr.
7 Linebaugh worked as a flagger and as a forklift driver; by his own
8 testimony, these jobs required significant walking and standing.
9 Tr. 352-53.[14] I conclude that the ALJ's reasons for rejecting Dr.
10 Sedgwick's opinions--i.e., that 1) they are contradicted by other
11 substantial evidence in the record; 2) they predate the alleged
12 onset date and predate Mr. Linebaugh's ability to work in jobs
13 requiring walking and standing; and 3) the November 1997 opinion
14 indicates greater disability than July 1996, even though Dr.
15 Sedgewick had not seen Mr. Linebaugh during that interval--are
16 specific and legitimate.

17    Mr. Linebaugh assigns error to the ALJ's rejection of Dr.
18 Stewart's opinion that Mr. Linebaugh's significant limp might well
19 necessitate use of a cane, and that he might have difficulty
20 getting up stairs and over uneven terrain without it. The ALJ
21 disregarded this opinion on the ground that the cane had not been
22 specifically prescribed by a physician. Mr. Linebaugh argues that
23 Dr. Stewart assumes the medical necessity of a cane, and asserts

24

25    [14] Mr. Linebaugh testified that he worked as a flagger "off
26 and on for almost two years," and that one of his forklift jobs,
   which he had for six or seven months, "had me on my feet part of
27 the time." Tr. 350-52.

28 FINDINGS AND RECOMMENDATION Page 32

1 that had the ALJ considered his need for a cane, the job of flagger
2 would have been ruled out.

3     I am unpersuaded by Mr. Linebaugh's argument that Dr.
4 Stewart's opinion that Mr. Linebaugh "might" need a cane to get up
5 stairs and over uneven terrain constitutes substantial evidence
6 that Mr. Linebaugh is required to use a cane and therefore is
7 unable to do the job of a flagger. Such a conclusion is
8 contradicted by Dr. Stewart's opinion that Mr. Linebaugh could
9 stand and walk for six hours of an eight hour work day, "limited by
10 his subjective complaint of pain." Tr. 161-62. Mr. Linebaugh has
11 the burden of proving that he has a medically determinable physical
12 impairment; Dr. Stewart's opinion is not sufficient to establish
13 the existence of an impairment necessitating the use of a cane. I
14 find no error by the ALJ here.

15     4.   Rejection of claimant's testimony

16     Once a claimant shows an underlying impairment and a causal
17 relationship between the impairment and some level of symptoms,
18 clear and convincing reasons are needed to reject a claimant's
19 testimony if there is no evidence of malingering. Smolen v. Chater,
20 80 F.3d 1273, 1281-82 (9th Cir. 1996). A claimant's testimony about
21 pain may be disregarded if it is unsupported by medical evidence
22 which supports the existence of such pain, although the claimant
23 need not submit medical evidence which supports the degree of pain.
24 Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991)(en banc).
25 See also Vertigan v. Halter, 260 F.3d 1044 (9th Cir. 2001)(fact that
26 claimant's testimony not fully corroborated by objective medical

27

28 FINDINGS AND RECOMMENDATION Page 33

1  findings, in and of itself, is not clear and convincing reason for

2  rejecting it).

3      Factors that the ALJ may consider when determining the

4  credibility of a claimant's reports of pain or other symptoms

5  include the claimant's daily activities, inconsistencies in

6  testimony, effectiveness or adverse side effects of any pain

7  medication. Orteza v. Shalala, 50 F.3d 748 (9th Cir. 1995). The ALJ

8  may also consider the claimant's ability to perform household

9  chores, lack of side effects from prescribed medications, and the

10  unexplained absence of treatment for excessive pain when

11  determining whether claimant's complaints of pain and fatigue are

12  exaggerated. Id.

13      The ALJ rejected Mr. Linebaugh's testimony because 1)

14  objective medical evidence did not "fully support" his complaints,

15  tr. 323, in that objective clinical findings were minimal with

16  respect to neck pain and back pain; 2) Mr. Linebaugh's statement

17  that he was a motorcycle enthusiast contradicted his statements

18  that he could do very little housework and could sit and stand for

19  only about five minutes because of back pain; 3) Mr. Linebaugh's

20  reports to Dr. Kruger about his activities of daily living were

21  inconsistent with his testimony about musculoskeletal impairments;

22  4) Mr. Linebaugh reported to Dr. Stewart that he last worked as a

23  forklift driver during the summer of 2003, which was inconsistent

24  with his alleged musculoskeletal disability onset date of November

25  2, 2002; and 5) Mr. Linebaugh takes only ibuprofen and

26  acetaminophen for pain, having refused stronger medications, and

27

28  FINDINGS AND RECOMMENDATION Page 34

1  receives no other treatment for musculoskeletal pain, indicating
2  that the pain is not severe.

3      While the medical evidence supports the existence of pain from
4  the ankle injury, objective evidence of a condition or conditions
5  causing Mr. Linebaugh neck pain radiating into the temple are not
6  apparent in the record. Mr. Linebaugh first complained of neck pain
7  on February 15, 2005. X-rays and an MRI of the cervical spine taken
8  in March 2005 showed "some degenerative changes," but "no acute
9  abnormality." Tr. 278. An MRI of the cervical spine in October 2005
10 showed no cord impingement.

11     X-rays and MRIs of the lumbar spine do show some degenerative
12 changes, as well as moderate stenosis at L4-5. Thus, Mr.
13 Linebaugh's complaint of back pain is supported by clinical
14 findings showing the existence of a condition that could cause
15 pain. There is no clinical evidence of a condition causing numbness
16 of the left leg.

17     I conclude that the ALJ's adverse credibility finding on the
18 basis of objective clinical findings is erroneous with respect to
19 the back pain and ankle pain, but not erroneous with respect to the
20 complaints of neck pain and numbness of the left leg.

21     Mr. Linebaugh testified at the hearing that he rides a Harley-
22 Davidson motorcycle a distance of 45 miles approximately once a
23 month, with two stops to rest his back. Tr. 360. In January 2004,
24 Mr. Linebaugh indicated to Dr. Kruger that he rode his motorcycle
25 every afternoon, weather permitting, tr. 164. I find no error in
26 the ALJ's conclusion that Mr. Linebaugh's report of riding a

27

28 FINDINGS AND RECOMMENDATION Page 35

1  motorcycle over substantial distances and on a regular basis is
2  inconsistent with his testimony that he cannot sit without having
3  his leg go numb and his back start cramping, and that he suffers
4  from excruciating neck, back and leg pain.

5      Nor did the ALJ err in finding Mr. Linebaugh's testimony that
6  he was unable to sit or stand for more than five minutes at a time,
7  see tr. 369, see also tr. 110 (report dated November 2003),[15] is
8  inconsistent with Mr. Linebaugh's earlier reports of his activities
9  of daily living. In 2004, Mr. Linebaugh told Dr. Kruger he spent
10 his mornings sitting in a tavern drinking coffee, visiting with
11 friends and watching television, and that he spent his afternoons
12 watching television, visiting with friends, and riding his
13 motorcycle. Tr. 164. Mr. Linebaugh said he watched more television
14 in the evening. Id. In the November 2003 report, Mr. Linebaugh
15 stated that he spent about 75% of each day watching television. Tr.
16 115. These statements are inconsistent with the asserted inability
17 to sit or stand for more than five minutes at a time.

18     The ALJ also noted the inconsistency between Mr. Linebaugh's
19 testimony at the hearing that he had been unable to do household
20 chores since injuring his ankle,[16] and his report to Dr. Kruger in

21

22     [15] Mr. Linebaugh's assertion that he is unable to sit or
23 stand for more than five minutes before needing to rest is also
   documented in a report dated November 20, 2003. See tr. 110. In
24 that document, Mr. Linebaugh states that he can be "up and
   active" before needing rest for five minutes, and that he is
25 unable to finish a task that takes longer than about five
   minutes. Id.
26
       [16] See also the November 2003 report in which Mr. Linebaugh
27 states that he neither prepares his own meals nor does any

28 FINDINGS AND RECOMMENDATION Page 36

2004 that he was able to prepare simple foods and do various housekeeping tasks such as "kitchen and general house clean up and his personal laundry." Tr. 165. This credibility finding is based on substantial evidence in the record and is not erroneous.[17]

The ALJ's adverse credibility finding based on inconsistent statements about Mr. Linebaugh's work history is not erroneous.

Mr. Linebaugh argues that the record shows he has tried stronger pain medications, but they became ineffective, tr. 367, and that he is fearful about taking medications. Tr. 367. This is not an accurate characterization of the record. Mr. Linebaugh testified that he did not take stronger pain medication because "I've got a real phobia about taking pills." Tr. 367. But this does not explain why Mr. Linebaugh is phobic about taking prescription medications in pill form, but is able to take over the counter medications such as ibuprofen and Tylenol, which are also taken as pills. Mr. Linebaugh did not testify that stronger pain medications became ineffective, and the medical reports do not suggest that they were. There is no indication in the record that Mr. Linebaugh has sought other treatments, not requiring him to take pills, for musculoskeletal pain, such as physical therapy or a TENS unit.

_____

housework except for his own bedroom. Tr. 113. Compare report of April May dated November 30, 2003, in which Ms. May states that Mr. Linebaugh prepares food on a daily basis and does cleaning, laundry, and small repairs. Tr. 121.

[17] Mr. Linebaugh's girlfriend, April May, stated in a report dated November 2003 that Mr. Linebaugh was able to clean, do laundry, and make small repairs on a weekly basis, and was able to prepare simple meals on a daily basis. Tr. 121. She stated that his daily activities consisted of watching TV, spending time with friends, doing laundry, and reading. Tr. 119.

1   Mr. Linebaugh also argues in his brief that there are
2   "indications that a lack of sufficient funds and/or insurance
3   coverage has discouraged Plaintiff from seeking additional medical
4   treatment." This argument is unconvincing in view of Mr.
5   Linebaugh's access to treatment at the VA, as evidenced by
6   extensive VA medical records for the period between 2002 and 2006.[18]

7   I find no error in the ALJ's rejection of Mr. Linebaugh's
8   testimony about the severity of his symptoms.

9   5.   Rejection of lay witness testimony

10   Mr. Linebaugh asserts that the ALJ erred in rejecting the
11   testimony of his two lay witnesses, friend Tom Gorman and
12   girlfriend April May. Ms. May submitted a third party report on
13   November 30, 2003, stating that she and Mr. Linebaugh lived
14   together. Tr. 119. She stated that she had then known Mr. Linebaugh
15   for about one year. Id.

16   In response to a question about what Mr. Linebaugh was able to
17   do before his alleged disability that he cannot do now, she wrote,
18   "Work, stand and walk for long periods."[19] In her report, Ms. May

19

20   [18] These records indicate that Mr. Linebaugh has been seen at
21   the VA from 2002 forward for glasses, audiology evaluations, a
     vasectomy, numerous lab tests, x-rays, dental care, and
22   counseling, and that he has been treated for musculoskeletal pain
     as well as several other ailments. Tr. 169-217, 263-341.
23

24   [19] The admissibility of this statement is dubious, since Mr.
     Linebaugh alleges disability since November 2002. Ms. May states
25   that as of November 2003, she had known Mr. Linebaugh for one
     year, that is, since November 2002. If Ms. May did not know Mr.
26   Linebaugh before his alleged onset date, she has little or no
     personal knowledge of what Mr. Linebaugh was able to do before
27   the alleged onset date.

28   FINDINGS AND RECOMMENDATION Page 38

states that Mr. Linebaugh can prepare only simple meals because of limited standing ability, although he does so daily. Tr. 121. She reports that Mr. Linebaugh is able to clean, do laundry, and make small repairs, but only on a weekly basis. Id. In response to a question about hobbies, Ms. May states that Mr. Linebaugh's hobbies are "carpentry, woodwork, reading, motorcycle enthusiast," but then states that he is "unable to be on leg to do carpentry and woodworking." Id.

Tom Gorman submitted a statement dated April 3, 2006. Mr. Gorman stated that Mr. Linebaugh moved in with him in 2002, and that they were roommates for about two years, tr. 155,[20] which indicates that Mr. Gorman and Mr. Linebaugh lived together from about 2002 to about 2004. Mr. Gorman stated that by the time Mr. Linebaugh moved in with him, Mr. Linebaugh was having trouble with standing and walking, and that his back was also bothering him. Id. Mr. Gorman wrote, "Mainly, Dan spent his off-work time in the recliner, with his feet up," and that because Mr. Linebaugh could "hardly walk or stand for more than a few minutes, I took care of all the chores around the house. I usually did the cooking as well, or we ordered take out or delivery." Id.

Mr. Gorman said he noticed Mr. Linebaugh called in sick from work because of his ankle three or four times a month, and that as a result he lost his job. Id. Mr. Gorman and Mr. Linebaugh share an interest in motorcycles; according to Mr. Gorman, Mr. Linebaugh

---

[20] This statement is inconsistent with Ms. May's statement that she had lived with Mr. Linebaugh from 2002 to 2003.

FINDINGS AND RECOMMENDATION Page 39

1  rides what is called a "Geezer Glide," a motorcycle that is
2  comfortable to sit on, has an electric instead of a kick starter,
3  and has "more leg room and easier foot controls than most cars."
4  Id. Mr. Gorman reports that Mr. Linebaugh is "complaining a lot
5  more about his back and neck now, and he has even more difficulty
6  walking and standing, even with his cane." Id. Mr. Gorman said that
7  Mr. Linebaugh's girlfriend "takes care of all the housework and
8  cooking, since he is simply not able to get around anymore." Id.

9      Lay testimony as to a claimant's symptoms is competent
10  evidence which the Commissioner must take into account, Dodrill v.
11  Shalala, 12 F.3d 915, 919 (9th Cir. 1993), unless the ALJ expressly
12  determines to disregard such testimony, in which case "he must give
13  reasons that are germane to each witness." Id. While lay witnesses
14  are not competent to testify to medical diagnoses, they may testify
15  as to a claimant's symptoms or how an impairment affects the
16  claimant's ability to work. Nguyen v. Chater, 100 F.3d 1462 (9th
17  Cir. 1996).

18      The ALJ rejected Ms. May's estimate that Mr. Linebaugh could
19  lift 15 pounds, walk one to two blocks, and stand for about five to
20  10 minutes, on the ground that Ms. May had "no expertise in
21  vocational or medical matters," and because her estimates were "not
22  sustained by the objective medical evidence of record." Tr. 32. A
23  lay witness is not required to be an expert in vocational or
24  medical matters, and the evidence of a lay witness need not be
25  supported by objective medical evidence, in order to be competent
26  ///

27

28  FINDINGS AND RECOMMENDATION Page 40

1  evidence of a claimant's symptoms. The ALJ's rejection of Ms. May's

2  statements on these grounds is erroneous.

3      I find no indication in the record that the ALJ rejected any

4  other part of April May's statement. In his opinion, the ALJ

5  repeated Ms. May's description of Mr. Linebaugh's daily activities,

6  and concluded that the description contained in Ms. May's report

7  comprised "reasonably normal activities of daily living." Tr. 32.

8  Consequently, the ALJ concluded, Ms. May's statement indicated that

9  Mr. Linebaugh was more active than Mr. Gorman's report indicated.

10 I find no error here.

11     The ALJ rejected Mr. Gorman's "entire report" because he was

12 "clearly [trying] to advocate for the claimant's disability,"

13 because it was inconsistent with "other statements of record," and

14 because of the "absence of significant objective findings." Tr. 32.

15     The ALJ's rejection of Mr. Gorman's report because the absence

16 of significant objective findings is erroneous. There is no

17 requirement that a lay witness's testimony be based on "objective

18 findings." However, Mr. Gorman's statement that he took care of all

19 the chores around the house and did the cooking is contradicted by

20 Mr. Linebaugh's report to Dr. Kruger in 2004 that he was able to

21 prepare meals and clean the house. I note also that Mr. Gorman's

22 statement indicates that for at least some of the time he lived

23 with Mr. Linebaugh, Mr. Linebaugh was working ("Dan spent his off-

24 work time in a recliner"), which is inconsistent with Mr. Gorman's

25 statement that Mr. Linebaugh could "hardly walk or stand for more

26 than a few minutes." Mr. Gorman's statement that Mr. Linebaugh

27

28 FINDINGS AND RECOMMENDATION Page 41

1  spent  most  of  his  time  in  a  recliner  with  his  feet  up  is
2  inconsistent with Mr. Linebaugh's statement to Dr. Kruger in 2004
3  that he spent his days sitting in a tavern, visiting with friends,
4  watching television, and riding his motorcycle. I find no error in
5  the ALJ's rejection of Mr. Gorman's statements.

6       6.  <u>Incomplete hypothetical to VE</u>

7       Mr. Linebaugh asserts that the ALJ failed to include some of
8  his most significant limitations (inability to stand or walk for
9  more than short periods at a time, to walk safely on uneven terrain
10 or climb stairs without a cane, to hear adequately in a noisy
11 environment) in his hypothetical to the VE at step four.

12      The ALJ must propose a hypothetical that is based on medical
13 assumptions supported by substantial evidence in the record that
14 reflects each of the claimant's limitations. <u>Osenbrock v. Apfel</u>,
15 240 F.3d 1157, 1163 (9th Cir. 2001. An ALJ is free to accept or
16 reject restrictions in a hypothetical question that are not
17 supported by substantial evidence. <u>Id.</u> at 1165. If the claimant
18 fails to present evidence that he suffers from certain limitations,
19 the ALJ need not include those alleged impairments in the
20 hypothetical question to the VE. <u>Id.</u> at 1164. If the ALJ's
21 hypothetical does not reflect all of a disability claimant's
22 limitations, the VE's testimony has no evidentiary value to support
23 a finding by the Commissioner that the claimant can perform jobs in
24 the national economy. <u>Matthews v. Shalala</u>, 10 F.3d 678 (9th Cir.
25 1993).

26 ///

27

28 FINDINGS AND RECOMMENDATION Page 42

1    As discussed above, the ALJ did not include in his
2 hypothetical to the VE Mr. Linebaugh's hearing loss and tinnitus
3 and did not adequately address the effect of Mr. Linebaugh's
4 missing left thumb on his ability to do work identified by the VE.
5 The ALJ also failed to make findings about whether Mr. Linebaugh's
6 obesity affected his ability to work; if it did, the ALJ should
7 have included obesity in his hypothetical to the VE.

8    I recommend that this case be remanded for reformulation of
9 the hypothetical to the VE and the taking of additional evidence
10 from the VE, if it is determined on remand that it is necessary for
11 the Commissioner to proceed to step five of the sequential
12 analysis.

13    7.   Disability findings under the grids

14    There are two ways for the Commissioner to meet the burden of
15 showing that there is other work in "significant numbers" in the
16 national economy that claimant can perform: a) by the testimony of
17 a vocational expert, or b) by reference to the Medical-Vocational
18 Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2, known as "the
19 grids." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999);
20 Desrosiers v. Secretary of Health and Human Servs., 846 F.2d 573,
21 577-78 (9th Cir. 1988)(Pregerson, J., concurring).If the grids
22 accurately and completely describe a claimant's impairments, the
23 ALJ may apply the grids instead of taking testimony from a
24 vocational expert. Holohan v. Massinari, 246 F.3d 1195, 1208 (9th
25 Cir. 2001); Reddick, 157 F.3d at 729.
26 ///

27

28 FINDINGS AND RECOMMENDATION Page 43

1    Mr. Linebaugh argues that because the ALJ's conclusion that he
2  was able to return to his past work as a flagger was clearly
3  erroneous, the only jobs the VE could identify that Mr. Linebaugh
4  could perform were those of electronics worker, parking lot
5  cashier, and small parts assembler.

6    As a threshold matter, I disagree with Mr. Linebaugh's
7  argument that the ALJ erred in finding him able to return to his
8  past work as a flagger, because the argument is premised on
9  acceptance of Dr. Sedgewick's opinion, rather than the opinions of
10 Doctors Stewart, Eder and Kehrli. As discussed, I find no error in
11 the ALJ's rejection of Dr. Sedgewick's opinion.

12   Although the VE characterized electronics worker, parking lot
13 cashier, and small parts assembler as "light" jobs, tr. 372, 373,
14 Mr. Linebaugh argues that the VE's description of these jobs as
15 applied to him were essentially sedentary jobs. Under the grids, a
16 person of Mr. Linebaugh's age and education who is limited to
17 sedentary work is deemed disabled. See 20 C.F.R. Part 404, Subpart
18 P, App. 2, § 201.14 (person limited to sedentary work, between the
19 ages of 50 and 54, with a high school education and semiskilled
20 work history, but no transferable skills deemed disabled).

21   The VE did describe these jobs as being done mostly from a
22 sitting position, with periods of standing and walking of five
23 minutes' duration or less. Tr. 373-74. The VE explained that many
24 jobs defined as light "don't require anything more than a
25 negligible amount of lifting, and they also are performed in a
26 seated position." Tr. 374-75. The VE's testimony is in conformance

27

28 FINDINGS AND RECOMMENDATION Page 44

1   with Social Security regulations, which state that light work may
2   involve either "a good deal of walking or standing," or "sitting
3   most of the time with some pushing and pulling of arm or leg
4   controls." 20 C.F.R. § 416.967(b).

5        The flaw in Mr. Linebaugh's argument that the VE's testimony
6   necessarily limits him to sedentary jobs and that he therefore must
7   be found disabled under the grids, is that the ALJ accepted the
8   opinions of Doctors Stewart, Eder and Kehrli that Mr. Linebaugh was
9   capable of standing and walking for six hours out of an eight hour
10  day, and rejected the opinion of Dr. Sedgewick and the testimony of
11  Mr. Linebaugh testimony that he was unable to walk or stand for
12  more than a few minutes at a time.  The opinions of Doctors
13  Stewart, Eder and Kehrli support a finding that Mr. Linebaugh is
14  capable of light work. See 20 C.F.R. § 416.967(b)(Light work
15  involves "a good deal of walking or standing.") The ability to do
16  light work includes the ability to do sedentary work, "unless there
17  are additional limiting factors such as loss of fine dexterity or
18  inability to sit for long periods of time." Id. Even if the three
19  jobs identified by the VE are considered sedentary, the opinions of
20  Doctors Stewart, Eder and Kehrli support a finding that he is
21  capable of light work; thus Mr. Linebaugh is not limited to
22  sedentary jobs. However, as discussed above, The ALJ made no
23  findings on Mr. Linebaugh's ability to perform these three jobs if
24  his the VA's disability award based on his tinnitus and partial
25  hearing loss is considered.
26  ///
27
28  FINDINGS AND RECOMMENDATION Page 45

8.    <u>Remand</u>

I find no error in the ALJ's rejection of the opinion of Dr. Sedgewick that Mr. Linebaugh is unable to walk or stand more than 10 or 15 minutes; Dr. Stewart's opinion that Mr. Linebaugh might need a cane; and Mr. Linebaugh's testimony about his physical capacity. However, the ALJ's findings are incomplete with respect to whether Mr. Linebaugh's partial hearing loss, tinnitus, obesity, and amputated thumb constitute severe impairments, and, if so, what effect these impairments have on his ability to work; the weight the ALJ has given to the VA disability rating; and the evidence given by the VE.

The decision whether to remand for further proceedings turns upon the likely utility of such proceedings. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1179 (9th Cir. 2000). Whether to remand under sentence four of 42 U.S.C. § 405(g) is a matter of judicial discretion. <u>Id.</u> at 1177. Because the record in this case is not fully developed, see, e.g., <u>Holohan</u>, 246 F.3d at 1210 and <u>Ghokassian v. Shalala</u>, 41 F.3d 1300, 1303 (9th Cir. 1994), I recommend that this case be remanded to the Commissioner for further proceedings to resolve the issues enumerated above.

**Conclusion**

I recommend that this case be remanded for additional administrative proceedings, so that the ALJ can address the issues of 1) Whether Mr. Linebaugh's partial hearing loss, tinnitus, obesity, and amputated left thumb constitute severe impairments and, if so, the effect of these impairments on Mr. Linebaugh's

FINDINGS AND RECOMMENDATION Page 46

1   residual functional capacity through his date last insured for

2   purposes of disability benefits; and 2) whether, considering any

3   impairments not previously considered, Mr. Linebaugh was able to

4   return to his past work, or perform other work existing in the

5   national economy, as of his date last insured.

6                          **Scheduling Order**

7        The above Findings and Recommendation will be referred to a

8   United States District Judge for review. Objections, if any, are

9   due September 18, 2008. If no objections are filed, review of the

10  Findings and Recommendation will go under advisement on that date.

11  If objections are filed, a response to the objections is due

12  October 2, 2008, and the review of the Findings and Recommendation

13  will go under advisement on that date.

14       Dated this 3rd day of  September  2008.

15

16                               /s/ Dennis James Hubel

17                            Dennis James Hubel
                              United States Magistrate Judge
18

19

20

21

22

23

24

25

26

27

28  FINDINGS AND RECOMMENDATION Page 47